John S. Feinberg, Appellant, v. Chicago, Burlington & Quincy Railroad Company, Appellee.

Gen. No. 40,542.

Opinion filed May 2, 1939. Rehearing denied May 20, 1939.

KROHN & MacDONALD, of Chicago, for appellant. STUART B. KROHN, of counsel.

WALTER McFARLAND, W. A. MORROW, A. C. SCOTT, S. F. BLANC and C. W. KROHL, all of Chicago, for appellee; J. C. JAMES, of Chicago, of counsel.

MR. PRESIDING JUSTICE SCANLAN delivered the opinion of the court.

A suit for damages for personal injuries sustained by plaintiff. At the conclusion of plaintiff's case defendant made a motion, in writing, for a peremptory instruction, accompanied by an instruction, to find defendant not guilty, which motion and instruction were refused. Defendant offered no evidence, but again moved for a peremptory instruction of not guilty, accompanied by a written instruction to that effect, and the trial court reserved its ruling upon the motion and instruction. The jury returned a verdict finding de-

fendant guilty and assessing plaintiff's damages in the sum of $9,000. Thereupon defendant filed a motion, in writing, for a judgment in its favor notwithstanding the verdict, and also filed an alternative motion, in writing, for a new trial. The trial court granted the motion for a judgment for defendant notwithstanding the verdict and plaintiff appeals from the judgment entered in favor of defendant.

The first paragraph of the complaint alleges that defendant, on August 27, 1935, owned, operated and controlled a certain line of railroad extending· in a generally northeasterly and southwesterly direction through Lincoln, Nebraska, and upon said line operated,· maintained and controlled trains of cars, both freight and passenger, drawn by locomotives. Paragraph two alleges, in substance, that the depot and freight house of defendant were located on said line so extending through a portion of Lincoln and along and across various intersecting streets of said city; that near the said depot and freight house defendant used divers switch tracks, spur tracks, side tracks, and main line tracks, upon which, at all times, there were standing various cars and trains of cars "from which goods and freight were being loaded and unloaded"; that said cars and trains were often left upon said tracks, for convenience, when not used, and some of said cars and trains were frequently moved back and forth by locomotives in switching movements over said tracks; that at various times said cars, trains and locomotives blocked the progress of pedestrians who were then and there rightfully attempting to cross said line of railroad, so that it became and was necessary for such pedestrians, in order to cross said line of railroad, to pass through gaps between the various cars and trains of cars so blockading said streets, so that on the date aforesaid, under the then existing conditions, defendant might reasonably expect and anticipate pedestrians

to be passing through the various gaps and apertures between the various cars and trains of cars then and there placed and standing upon and along said line, all of which defendant knew, or in the exercise of due and proper care would or should have known; that it thereupon became and was the duty of defendant, in the operation of its said line of railroad, cars, and trains of cars to be conscious of and have due regard to the then surrounding conditions and circumstances and not to wilfully and wantonly operate or move any of its said cars or trains of cars in a wilful, wanton and reckless manner or with conscious indifference and disregard to the then existing conditions and surrounding circumstances so as to injure anyone then and there so passing through said gaps and apertures between said cars and trains of cars. Paragraph three alleges, in substance, that about 9:30 p.m. on August 27, 1935, defendant caused a certain train of cars to be standing for a long time, to wit, two hours, upon one of its main line tracks at the place aforesaid, and caused a certain train of cars to be standing upon a certain side track immediately adjacent thereto, in such a manner as to completely block the various public highways then and there crossing its said line of railroad at that place and in such a manner that the only means of ingress and egress for pedestrians then and there rightfully traveling upon and along said public highway and desirous of crossing said line of railroad at that time and place were by means of and through the various gaps and apertures so left open by defendant in said two trains of cars then and there standing upon said main line tracks and immediately adjacent switch track of defendant for the express purpose of permitting pedestrians to cross as aforesaid; that at said time and place defendant wilfully and wantonly, with conscious indifference to the then existing conditions and surrounding circumstances,

caused said train of cars so standing on said switch track to be suddenly propelled or moved without giving any warning or notice by blowing a whistle, ringing a bell, or otherwise, by means whereof plaintiff, who was then and there attempting to cross, as he lawfully might, said line of railroad through one of said gaps so left in said train of cars standing on said switch track for said express purpose, and being then and there in the exercise of due and ordinary care for his own safety, was run over, struck and thrown beneath the wheels of one of said cars to and upon the ground there. Paragraph four alleges, in substance, that before plaintiff entered said gap there was no locomotive attached to either end of said train of cars and for that reason plaintiff, in the exercise of due and ordinary care for his own safety, well knew that said train of cars would not and could not be propelled or moved in either direction until a locomotive should be attached to either end thereof, and plaintiff, so knowing, proceeded to cross through said gap in said train, all of which defendant then and there well knew, or in the exercise of due and proper care under the then existing conditions and surrounding circumstances would and should have known; and while plaintiff was in the act of passing through said gap and at a time when he was in between two adjacent cars of said train aforesaid, and thus in a position of peril, which such position of peril on the part of plaintiff was apparent to the servants of defendant, or by the exercise of due and proper care should have been apparent, defendant wantonly and wilfully, with conscious indifference to the then existing conditions and surrounding circumstances, suddenly and without any warning or notice by blowing a whistle, ringing a bell or otherwise, caused a certain locomotive with a car or cars attached thereto, which had been standing upon its main line track immediately adjacent to said switch track on which said

train of cars through which plaintiff was then and there passing had been so standing, to be violently and suddenly propelled and moved from said main line track onto said switch track and up to and against said standing trains of cars on said switch track with such force and violence that the entire train of cars so standing on said switch track was moved and propelled forward thereby a distance of, to wit, 15 or 20 feet, and said gap or aperture through which plaintiff was then and there passing as aforesaid, was then and thereby violently and suddenly closed and plaintiff was caught between the ends of the two adjacent cars and crushed thereby and caused to be run over by the wheels of said adjacent car or cars. The fifth paragraph alleges general negligence and that plaintiff and "a group of pedestrians" were then and there passing through said gaps in said train of cars standing on said switch track, by the express invitation of defendant. On motion of defendant that paragraph was stricken. Plaintiff has not assigned error thereon.

The only witness who testified as to the accident and the *locus in quo* was plaintiff. His testimony, in substance, is as follows: He lived in Chicago at the time of the accident, August 27, 1935, and was then 18 years of age. He and an acquaintance, Joseph Schrimmenti, who was about the same age as plaintiff, decided that they would beat their way on freight trains from Chicago to San Diego, California,. where they expected to see the fair. At the time they left Chicago plaintiff had five dollars and Schrimmenti one dollar. Several days before the accident they started on the trip, and around 9 or 10 o'clock p.m. reached Brookfield, Cook county, Illinois, where they boarded a box car on a freight train and rode on that train until they reached Rockford, Illinois, the next morning, where the train stopped. "Right away" they boarded another freight train and rode "inside an open boxcar" until the train

reached Waterloo, Iowa, "after dark the same evening." They then got off that train, walked into the town, and stopped there three or four hours. They then boarded another freight train and rode inside a box car until the train reached Galena, Illinois, when they alighted and walked to Dubuque, Iowa, where they spent three or four hours. When it became dark they went to the freight yards located there, entered a box car attached to a freight train and rode therein until they reached Council Bluffs, Iowa, where they remained a short time. They then walked over the bridge which crosses the river at that place and reached Omaha on the other side. After a very short stay in Omaha they went to the freight yards located there, got inside a box car on a freight train and rode to Lincoln, Nebraska, arriving there about 3 o'clock p.m. Neither had ever been there before. From the time they left Chicago until they reached Lincoln they obtained food from persons who gave it to them, or they bought it. In Lincoln someone directed them to the "Mission," which was "quite a ways" from the point where they got off the train. At the Mission they "inquired around if they were doing any hiring or anything in town and they said no"; they "washed up and waited to 6:00 o'clock to get their dinner." They did not have to pay for the dinner. After eating they stayed at the Mission a few minutes and then walked toward the railroad tracks. After walking a few blocks they "came to the stub-end of the street at the railroad track," and then they "continued on across the railroad track." On the side of the tracks where the Mission was located "the streets lead up to the right of way there"; "the streets came to an end there." "I couldn't say the exact number of tracks we crossed, there was a lot of them; it seemed about a short block in extent, and we walked across those railroad tracks

over to the further side of them; it couldn't have been later than 6:30 at that time; we were over on the other side of the tracks a couple of hours. I believe I was hit between nine and half past. We were walking around looking at different places to see if we could see anybody still working over there. We saw people but we didn't see anybody working.'' They decided to return to the Mission and walked across the same tracks, but not at the same ''spot'' where they had first crossed, because they had ''walked down a little ways. While we were looking along the other side.'' ''I am not positive of the direction I walked in.'' When they reached about the middle of the tracks they saw ''a line of boxcars standing along there,'' but could not say how long the line of cars was; ''it didn't seem like there were over 3 or 4 cars; something like that,'' in the direction toward Chicago; ''I couldn't say how many there were in the other direction.'' The freight cars were not all coupled together. There was ''a gap'' between two of the cars of about four feet. This gap ''was just opposite *those* streets,'' and was about half a mile from the depot. They decided to go through the gap. A stranger about the age of plaintiff passed through the gap ahead of plaintiff and his friend. ''Q. . . . When you reached the gap, did you see anybody else there besides this boy you told us about, and Joe, and yourself? A. There was a fellow on the other side. Q. On the other side of the track? A. Yes, sir. Q. That is, on the other side of the track these cars were on? A. Yes, sir. Q. All right, what did you notice about him? A. There was a man in overalls with a lantern, he was writing in a book he had there and looking on the freight cars. . . . Q. Now, well, what did this third fellow, the stranger to you, the boy that you didn't know, what did you see him do there? A. He walked over and he got into a conversation with this

fellow with the lantern. Q. Now, where did he have the conversation, I mean, with reference to which side of this string of freight cars did this lad have the conversation with this man with the lantern? A. On the opposite side of us. Q. Had he crossed through the gap? A. He had gone through it. It was just straight across from us he had gone through. Q. And what did Joe do? A. Joe started to follow through. Q. And did Joe go through the gap? A. Yes, sir.'' Plaintiff and his friend ''hesitated a while and then we went through.'' ''Q. How far was he ahead of your pal? A. I would say about twenty feet. Q. And how far were you behind your pal? A. I was right behind him. Q. How close to him? A. I would say about five feet. Q. Now, when you came to this space open between the two cars, your pal walked right through, didn't he? A. Yes, sir. Q. And you followed right after, five feet behind him? A. No, sir. Q. How far were you behind then? A. Well, it was a little more than that by that time. I guess I didn't follow him right through, I came through after him, but not immediately after him. Q. What were you doing? A. I was not doing anything. . . . Q. But you were walking right along, weren't you? A. Yes, sir.'' ''Q. Now, as you approached that gap, what did you see, if anything? · A. Well, I looked up and down to see if there was an engine on these cars, and there wasn't. Q. All right, what did you see? A. I saw on the other side this train was going down with a couple of cars on it. Q. When you say going down, you mean going away from Chicago or towards Chicago? A. Away from Chicago. Q. Was that on the track just next to the one these cars were on or not? A. Yes. Q. When you saw that train go on down with those cars and this man there, what did you do then? A. I started to go through then. Q. And as you were going through there, did you notice any-

thing unusual, did anything unusual happen? A. Well, this train was starting to come back again. Q. And had you cleared the gap when you saw this train starting to come back? A. No, I was looking around there at the thing and it started to come back. Q. Were you still in the gap when you saw the train coming? A. Yes, sir. Q. Starting to come back? A. Yes, sir. Q. Was that on this same track that you saw . . . it come up on? · A. Yes. Q. That was not on the track that these freight cars were on that you were going through there? A. No. Q. When you say you saw it coming back, was that coming towards Chicago then, when you say you looked out from the gap? A. Yes. Q. Now, then, what was the next thing that happened, as near as you can tell? Just tell us in your own words what you saw. A. Well, these trains that were coming back, these cars,—I was looking down the side like, and all of a sudden I seen it shoot over, . . . Q. When you say 'shoot over' which way did they shoot it? A. It started to come over towards this track where I was standing by these cars. . . ." "The next thing that happened was, as this train was coming back, all of a sudden I saw the cars shoot over and I heard a crash; when I say shoot over, it started to come over from the track it was on toward this track where I was between these cars, and I heard the crash and got knocked down; the side of the freight train knocked me down; it hit me on the side—this shoulder (indicating the right shoulder). I went down and backwards-like and the train rolled over my right leg. I lay there for a while and then I heard them coming; I mean these workers around there; I couldn't see them very well, but I saw them running around there; they were the only ones around there; I couldn't see what direction they came from; I was still under the train." "The stranger ran away. I never saw him after that." The witness further tes-

tified that railroad people picked him up, took him in an ambulance to St. Elizabeth's hospital, and that night his leg was amputated.

Plaintiff states that the "errors relied upon for reversal" are: "The court erred in entering a judgment in favor of the defendant and against the plaintiff for costs, *notwithstanding the verdict of the jury.* . . . 1. The plaintiff made out a *prima facie* case, and *there was no evidence at all produced by the defendant* to refute it. (a) There was ample evidence from which the jury could reasonably and logically hold the defendant guilty of wanton and wilful conduct. (a1) There was evidence of actual knowledge of the plaintiff's position of danger on the part of defendant's servants. (a2) There was evidence of conscious indifference to the then existing conditions and surrounding circumstances, and wanton and wilful disregard thereof, on the part of defendant. (a3) *Even if actual knowledge of plaintiff's position of peril were lacking,* the defendant could still be held guilty of wanton and wilful misconduct, if the evidence showed a conscious indifference to the then existing conditions and surrounding circumstances and a reckless disregard for the safety of the public generally."

Defendant contends that "The Court properly entered judgment for defendant notwithstanding the verdict and should have directed a verdict at close of plaintiff's evidence. (A) Plaintiff failed to prove the allegations of his complaint and failed to prove facts entitling him to recover. (B) There was no evidence of wanton and wilful conduct on part of defendant's servants. (C) There was no evidence of actual knowledge by defendant's servants of plaintiff's position. (D) There was no flying switch nor were the movements made wantonly or wilfully. (E) Plaintiff was a trespasser. . . . (F) The evidence does not show care-

lessness so gross in its nature as to indicate a mind reckless and regardless of consequences. (G) There was no evidence fairly tending to support plaintiff's claim and the trial Court has not denied plaintiff a right of trial by jury. (H) Plaintiff was himself guilty of wanton and wilful conduct as a matter of law.''

Plaintiff testified that as he and Schrimmenti were walking toward the railroad tracks ''the streets lead up to the right of way there''; ''the streets came to an end there''; they ''came to the stub-end of the street at the railroad track.'' There was no proof of any street or path across the tracks, nor was there any evidence that defendant invited or permitted the public to cross the tracks at the *locus in quo*. Indeed, there is no testimony that anyone, other than plaintiff, his companion, and the stranger ever crossed the tracks at the point of the gap or near that location. There is no evidence in the record tending to show that there were streets on the other side of the tracks. Plaintiff testified that the gap in question was ''just opposite *those streets*,'' referring to the stub-end streets on the Mission side of the tracks. He does not claim that he went into the railroad yards upon any business with defendant. He testified that they proceeded across the tracks to where there were loading platforms; that ''we were walking around looking at different places to see if we could see anybody still working over there. We saw people but we didn't see anybody working. We decided to return to the Mission.''

Plaintiff argues that ''the evidence fails to show whether he is a trespasser or not,'' but we find that the evidence conclusively establishes that plaintiff was a trespasser in defendant's freight yards after nightfall. Defendant insists that when plaintiff's entire testimony is considered it shows clearly that he and his companion were in the dark freight yards for two hours

for the sole purpose of stealing a ride on some freight train that might leave the yards headed for the west. In passing upon the court's action in entering judgment in favor of defendant notwithstanding the verdict of the jury, we must view the evidence in the most favorable light for plaintiff, and he testified that he and his companion were walking around at different places to see if they "could see anybody still working over there." Neither counsel asked plaintiff any questions as to whether he and his companion made any effort to ascertain if there was any freight train that might leave the yards for the west.

In *Bremer v. Lake Erie & W. R. R. Co.*, 318 Ill. 11, it is said (pp. 16, 17, 20, 21):

"In *Illinois Central Railroad Co. v. Godfrey, supra,* it was held when a trespasser on the track of a railroad company is struck and injured by an engine, the company can be held liable only for wanton or willful injury or such gross negligence as evidences willfulness. It is said in the opinion: 'It is only for wanton or willful injury that the defendant is here chargeable, or such gross negligence as evidences willfulness. Notwithstanding plaintiff was unlawfully upon defendant's right of way or not in the exercise of a legal right, and that his own lack of ordinary care exposed him to the risk of injury, yet the defendant might not, with impunity, wantonly or willfully injure him. And if defendant's servants who were in the management of the engine, after becoming aware of plaintiff's danger, failed to use ordinary care to avoid injuring him, defendant might be liable. And this, as we conceive, is the only measure of liability to be claimed, under the facts of this case.' The distinction is clearly made that a defendant owes the duty of ordinary care to a trespasser known to be in danger, to avoid injuring him. If by the exercise of ordinary care injury can be

avoided the defendant is liable for the failure to use such care, but to a trespasser whose presence or whose danger is unknown there is no duty to exercise ordinary care, though there is a duty not to injure him willfully or wantonly or by such gross negligence as evidences willfulness. The rule is stated in many of the cases cited that the defendant is not bound to anticipate the presence of trespassers on its property or to keep a lookout for them, and that its duty to exercise care to avoid injury to trespassers begins only when their presence is known. The rule is equally well settled that for an injury occasioned by the willful or wanton act of the defendant, or by such gross negligence as is equivalent to wantonness or willfulness, the defendant is liable. [Cases cited.] . . .

"The duty which a railroad company owes to a trespasser *before it has knowledge of his presence or danger is, not to do any willful or wanton act to injure him.* This duty, as was said in the *Neice* case, *supra* [*Neice v. Chicago and Alton Railroad Co.*, 254 Ill. 595], is owing to the public generally and is applicable to any one of the general public who happens to be in such a position as to be the sufferer by the violation of the duty, and such sufferer will have a right of action for any injury he sustains. The case of *East St. Louis Connecting Railway Co. v. O'Hara, supra* [150 Ill. 580], is an illustration of this rule, in which it was held that where the defendant was running its engine in wanton and willful disregard of the rights and safety of the public generally, it was not necessary, in order to raise an inference of wanton and willful negligence, to prove that the defendant's servants were actuated by ill-will directed specifically toward the plaintiff or to have known that he was in such a position as to be likely to be injured.

"If there is any evidence in the record fairly tending to show such a gross want of care as indicates a willful disregard of consequences or a willingness to inflict injury, then it is a question to be determined by the jury whether the negligent conduct of the defendant amounted to wantonness or willfulness. (*Walldren Express Co. v. Krug,* 291 Ill. 472.) What degree of negligence the law considers equivalent to a willful or wanton act is as hard to define as negligence itself, *and in the nature of things is so dependent upon the particular circumstances of each case as not to be susceptible of general statement.* The gross negligence which will justify the presumption of willfulness or wantonness is such as to imply a disregard of consequences or a willingness to inflict injury. (*Lake Shore and Michigan Southern Railway Co. v. Bodemer, supra* [139 Ill. 596].) An intentional disregard of a known duty necessary to the safety of the person, and an entire absence of care for the life, the person or the property of others, such as exhibits a conscious indifference to consequences, makes a case of constructive or legal willfulness such as charges the person whose duty it was to exercise care with the consequences of a willful injury. (1 Thompson on Negligence, secs. 20, 22.)" (Italics ours.)

In the late case of *Provenzano v. Illinois C. R. R. Co.,* 357 Ill. 192, 195, the court said: "In order to constitute willful and wanton misconduct the injury must either have been intentionally inflicted, or produced by acts so grossly negligent as to exhibit a reckless disregard for the safety of others. (*Brown v. Illinois Terminal Co.,* 319 Ill. 326.)"

It will be noted that plaintiff's errors relied upon for reversal are based upon the theory that defendant was guilty of wanton and wilful conduct, and the argument is that from plaintiff's testimony in reference to a man

in overalls, with a lantern, writing in a book and looking at the freight cars, it follows that this man then "had actual knowledge: (a) that there was a gap in the string of cars involved opposite a 'stub-end' street which provided the only means of egress and ingress to pedestrians desiring to cross the tracks at that point; (b) *that pedestrians were actually passing through the gap* because he was talking to the first pedestrian as he passed through; and the second one, the friend of the plaintiff, likewise emerged from the gap in full view of him; and the plaintiff was in the act of passing through only 5 feet behind the second pedestrian. (c) Actual knowledge of the switching and correlated movement going on in that immediate vicinity in connection with the string of cars involved." We will assume that the jury might reasonably infer from the evidence that this man was an employee of defendant. The fact that the man carried a lantern shows that it was dark in the yards. Plaintiff's evidence in reference to this man is that he was engaged in making notations in a book of some information that he was obtaining from the side of railroad cars, but his evidence fails to show that this man saw plaintiff or knew where he was. The mere fact that plaintiff saw a man carrying a lighted lantern does not tend to prove that that man saw plaintiff, who was then standing in the dark, between two freight cars. Plaintiff's further assumptions that the man with the lantern knew that cars were to be moved from one track to the other and that he had the power to control the movements of the switch engine are not warranted by the evidence. Plaintiff does not contend that the engine crew had any knowledge that plaintiff was standing between the two freight cars at the time the engine and cars attached to it started to come back. Indeed, the evidence fails to show that the engine crew had any knowledge or

reason to believe that plaintiff was standing in the gap between the two freight cars at any time. When the testimony of plaintiff as to all that he saw while he was standing in the gap is carefully considered, it is difficult to understand why he remained there. If defendant, under the facts, were held guilty of wilful and wanton conduct it would amount to a holding that defendant, in making up its freight trains in its freight yard at night and at a place where there was no street or passageway across the tracks, would be bound to take extraordinary care to avoid injuring trespassers who might be standing between cars and whose presence there was unknown to the servants of defendant.

As has been frequently stated, ''A willful or wanton act is as hard to define as negligence itself, and in the nature of things is so dependent upon the particular circumstances of each case as not to be susceptible of general statement.'' (*Bremer v. L. E. & W. R. R. Co., supra,* pp. 20, 21.) The following cases cited by plaintiff do not support his contention that defendant, under the evidence, was guilty of wilful and wanton negligence: In *Lerette v. Director General,* 306 Ill. 348, the accident occurred at a point where a public street, in the city of LaSalle, crosses the tracks of the Chicago, Burlington and Quincy Railroad Company. In *Heidenreich v. Bremner,* 260 Ill. 439, the plaintiff, a girl 13 years of age, was crossing Center avenue on a crosswalk of 18th street, in a thickly populated business section of Chicago, when she was knocked down by a team of horses driven by an employee of defendant. In *Lund v. Osborne,* 200 Ill. App. 457, plaintiff, a pedestrian, was struck by an electric car on a public crossing in the city of Highland Park, Illinois. The opinion states (pp. 461, 462): ''It is clearly the duty of those in control of street cars to exercise a greater degree of care and watchfulness when approaching a

street crossing or intersection than at other places along their route. (*Heidenreich v. Bremner,* 260 Ill. 439, and cases there cited.) This duty is particularly emphasized when the crossing or intersection is a busy one and much frequented. (*Chicago City Ry. Co. v. Tuohy,* 196 Ill. 410; *Chicago City Ry. Co. v. Fennimore,* 199 Ill. 9.)'' In *Jeneary v. Chicago & I. Traction Co.,* 306 Ill. 392, plaintiff was a foreman of a switching crew working for the New York Central Railroad Company. The accident occurred at the intersection of South street and Schuyler avenue, in Bradley. The tracks of the defendant, an interurban company, are laid in Schuyler avenue. The opinion states (p. 397): ''Whether the injuries were willfully and wantonly inflicted was, under the facts in this case, a question for the jury. The motorman knew that he was approaching a grade crossing over which a train might be expected to pass. The crossing was in a closely built-up portion of the village and a view of the same was somewhat obstructed by the surrounding buildings. It was a place where the interurban car was expected to stop, and yet the motorman approached the crossing on slippery tracks at such a high rate of speed that he was unable to stop in time to avoid the collision.'' In *Gannon v. Kiel,* 252 Ill. App. 550, plaintiff was struck by an automobile as he was crossing the crosswalk of a busy street intersection in East St. Louis. The last case cited, *Brown v. Illinois Terminal Co.,* 319 Ill. 326, also involved an accident at a public crossing.

Plaintiff insists that whether the personal injury sustained by plaintiff was caused by the gross or wanton negligence of defendant was a question of fact that the jury had a right to determine, and that to hold otherwise would be to deprive plaintiff of the right of trial by jury. ''While the question of willful or

wanton conduct is usually a question of fact for the jury, yet where all the evidence, viewed in its most favorable light for the plaintiff, does not tend to show a willful and wanton act done without regard to the safety of others, the jury should be directed to find a verdict for the defendant. Such is the case here.'' (*Morgan v. New York Central R. R. Co.*, 327 Ill. 339, 346.) Testing the action of the trial court in entering a judgment for defendant notwithstanding the verdict of the jury in the light of the above well-established rule, we feel satisfied that the court's action was fully justified by the proof. Whether or not defendant, at the time and place, was guilty of ordinary negligence is a question not before us for consideration; but we feel impelled to say that if such question were presented we would not hesitate to hold that a jury would not be justified in finding, under the particular circumstances of this case, that defendant was guilty of ordinary negligence. These two young men were still attending school, and, so far as the record shows, were entirely unfamiliar with the manner in which freight trains were made up and moved in freight yards. When the way in which they intended to make the long trip to San Diego is considered, it is apparent that they were facing grave dangers at every step of the road. Viewing the evidence in the most favorable light for plaintiff, it seems apparent to us that the unfortunate accident to plaintiff was due solely to his own negligence.

The judgment of the circuit court of Cook county is affirmed.

*Judgment affirmed.*

John J. Sullivan and Friend, JJ., concur.